# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

ARA, INC.,

        Plaintiff,

v.

WASTE MANAGEMENT NATIONAL
SERVICES, INC.,

        Defendant.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 17-159 (MJD/SER)

Daniel J. Cragg, Lara R. Sandberg, and Vince C. Reuter, Eckland & Blando, Counsel for Plaintiff.

Holli Pryor-Baze and Kallie A. Gallagher, Akin Gump Strauss Hauer & Feld, and Stephen P. Laitinen, Larson King, LLP, Counsel for Defendant.

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion to Dismiss

Plaintiff's Second Amended Complaint Pursuant to Federal Rule of Civil

Procedure 12(b)(6).  [Docket No. 44]  Because the UCC sections on which Counts

1 and 2 are based do not provide an independent cause of action for the secured

party, Defendant's motion is granted.

## II.    BACKGROUND

## A.     Factual Background

Plaintiff ARA, Inc., ("ARA") is a Minnesota corporation with its principal

place of business in Minnesota.  (Second Amended Complaint ("SAC") ¶ 1.)

Defendant Waste Management National Services, Inc., ("Waste

Management") is a Delaware corporation with its principal place of business in

Texas that provides waste removal and recycling services throughout the United

States, including Minnesota.  (SAC ¶ 2.)

JG Staffing, Inc., ("JG Staffing") was a Texas corporation with its principal

place of business in Arizona.  (SAC ¶ 8; SAC, Ex. B Factoring Agreement at 1.)  It

was controlled by Jeff and Michele Griffin.  (SAC ¶ 8.)

On December 29, 2009, JG Staffing entered into a Master Agreement with

Waste Management, under which JG Staffing provided temporary labor

personnel and services to Waste Management and Waste Management agreed to

reimburse JG Staffing through Waste Management's payment agent.  (SAC ¶ 8;

SAC, Ex. A.)

On May 4, 2011, JG Staffing entered into a factoring agreement with ARA.

(SAC ¶ 9; SAC, Ex. B, Factoring Agreement.)  ARA purchased JG Staffing's

invoices at a discount in exchange for the right to receive payment from the

customer on those invoices.  (SAC ¶ 9.)  The factoring agreement granted ARA a

security interest in JG Staffing's business assets to secure repayment of the invoices and authorized ARA to file a lien under the UCC to perfect its security interest.  (Id.)

On June 28, 2011, ARA filed a UCC financing statement with the Arizona Secretary of State (SAC, Ex. C), and on July 25, 2012, it filed a UCC financing statement with the Texas Secretary of State (SAC, Ex. D).  (SAC ¶ 10.)  Both financing statements name ARA as the secured party and JG Staffing as the debtor, and they describe the covered collateral, which includes "[a]ll present and future accounts receivable, contract rights and other obligations for payment of money" owing to JG Staffing, including "all accounts and general intangibles" and "all proceeds of the foregoing."  (SAC, Exs. C-D; SAC ¶ 11.)

Until 2015, ARA purchased millions of dollars of Waste Management invoices from JG Staffing.  (SAC ¶ 12.)  Waste Management, through its payment agent, paid those invoices from JG Staffing directly to ARA.  (Id.)

In September 2014, JG Staffing asked Waste Management to make two payments directly to JG Staffing's account.  (SAC ¶ 13.)  Waste Management knew that ARA owned JG Staffing's invoices and knew ARA had rights as an assignee and secured party.  (Id.)  Despite this knowledge, Waste Management

issued the two payments directly to JG Staffing.  (Id.)  After the two September

2014 payments, Waste Management then resumed issuing payments to ARA.

(Id.)

In March 2015, ARA learned that JG Staffing had breached the factoring

agreement with ARA.  (SAC ¶ 14.)  The day after ARA declared a material

breach of the factoring agreement, the Griffins formed a new entity called

Premium Placements, LLC ("Premium Placements").  (SAC ¶¶ 8, 15.)  The

Griffins transferred money, furniture, computers, and customer accounts,

including the Waste Management account, from JG Staffing to Premium

Placements.  (Id. ¶ 15.)  JG Staffing and Premium Placements offered the same

business services, occupied the same offices, and used the same equipment and

signs.  (Id. ¶ 16.)  ARA claims that the Griffins changed the name of their

business entity from JG Staffing to Premium Placements and continued the

business operations after transferring both customers and capital from JG

Staffing to Premium Placements.  (Id.)

Waste Management issued payments for invoices from JG Staffing directly

to JG Staffing.  (SAC ¶ 17.)  ARA contacted Waste Management and stated that

ARA continued to own JG Staffing invoices and that JG Staffing owed ARA

approximately $1 million and provided documentation to prove that ARA had a perfected security interest in all JG Staffing accounts receivable. (SAC ¶ 14; SAC, Ex. E.)

Waste Management knew that the Griffins owned both JG Staffing and Premium Placements and that JG Staffing had allowed some of its workers to transfer to Premium Placements. (Id. ¶ 18.) Despite this knowledge, in April 2015, Waste Management allowed its Arizona accounts to be transferred from JG Staffing to Premium Placements. (SAC ¶¶ 17, 19; SAC, Exs. F-G.)

## B. Procedural History

On January 18, 2017, ARA filed a Complaint against Waste Management in this Court. The Second Amended Complaint asserts: Count 1: Violation of Uniform Commercial Code Article 9-607; Count 2: Violation of Uniform Commercial Code § 9-406; Count 3: Breach of Contract; and Count 4; Account Stated. In Count 1, ARA claims that Waste Management failed to honor ARA's perfected security interest in JG Staffing's invoices and accounts receivable by paying invoices to JG Staffing in September 2014, to JG Staffing in March 2015 through May 2015, and, from April through November 2015, to Premium Placements, all on accounts receivable subject to ARA's lien against JG Staffing. In Count 2, ARA claims that Waste Management, as an account debtor, violated

ARA's rights as the assignee of JG Staffing's invoices and accounts receivable by paying the assignor (JG Staffing and Premium Placements). In both counts, ARA seeks recovery of payments that Waste Management made to JG Staffing and Premium Placements on the grounds that they were made contrary to ARA's security interest.

Waste Management now moves to dismiss Counts 1 and 2 of the Second Amended Complaint.

## III.   DISCUSSION

### A.   Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true. Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

In deciding a motion to dismiss, the Court considers the complaint and "materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. For example, courts may consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (citations omitted).

**B.    Choice of Law**

The Second Amended Complaint cites to the Texas, Arizona, and Minnesota UCC. (See, e.g., SAC ¶ 23.) Neither party addresses which state law should apply. Waste Management cites to the law of all three states in its briefing. ARA cites to Minnesota law, but asserts that the law of all three states is identical. (See Opp. Brief at 6 n.3.) Because neither party raises a conflict of law issue in this diversity case, the laws of Minnesota, the forum state, "apply by default." BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003)

**C.    Overview of UCC Article 9**

In general, Article 9 of the UCC applies to secured transactions, transactions that create "a security interest in personal property or fixtures by contract." Minn. Stat. § 336.9-109, subd. a(1). Article 9 attempts to "create commercial certainty and predictability by allowing third party creditors to rely

on the specific perfection and priority rules that govern collateral within the

scope of Article 9." Carlson v. Tandy Computer Leasing, 803 F.2d 391, 394 (8th

Cir. 1986).

### D. Count 1: UCC § 9-607

Section 9-607 of the UCC provides:

> If so agreed, and in any event after default, a secured party:
>
> (A) may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party;
>
> * * *
>
> (C) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral;

Minn. Stat. § 336.9-607, subd. a(1).

Further, "[t]his section does not determine whether an account debtor,

bank, or other person obligated on collateral owes a duty to a secured party."

Id., subd. e.

The Court holds that § 9-607 does not create an independent cause of

action. Rather, § 9-607 permits a secured party, such as ARA, to step into the

shoes of the debtor (JG Staffing), to assert a breach of contract claim or some

other claim against the account debtor (Waste Management).  See, e.g., Wells

Fargo Bank Nat. Ass'n v. Kal-Rich, Inc., 2010 Mass. App. Div. 103, 2010 WL

1740603, *3 (Mass. D. Ct. App. Div. 26, 2010) (discussing § 9-607 in the context of

claims for breach of contract and breach of guaranty).  In other words, § 9-607

defines ARA's rights as against JG Staffing, not as against Waste Management.

Section 9-607 explicitly provides: "Duties to secured party not affected.

This section does not determine whether an account debtor, bank, or other

person obligated on collateral owes a duty to a secured party."  Minn. Stat. §

336.9-607, subd. e.  The commentary states:

> Neither this section nor former Section 9-502 should be understood
> to regulate the duties of an account debtor or other person obligated
> on collateral.  Subsection (e) makes this explicit. . . .  This section
> establishes only the baseline rights of the secured party vis-a-vis the
> debtor-the secured party is entitled to enforce and collect after
> default or earlier if so agreed.

Minn. Stat. § 336.9-607, cmt. 6 (emphasis in original).

Although UCC § 1-305 provides that "[a]ny right or obligation declared by

the Uniform Commercial Code is enforceable by action unless the provision

declaring it specifies a different and limited effect," Minn. Stat. § 336.1-305, subd.

b; § 9-607(e) explicitly provides that it "does not determine whether an account

debtor . . . owes a duty to a secured party."  Thus, § 1-305 is trumped by the language of § 9-607 itself, stating that the section does not impose any duty on the account debtor.

As the Fourth Circuit explained, "[w]hile section 9-607 does give secured parties 'the right to enforce claims that the debtor may enjoy against others,' id. at cmt. 3, the text and commentary make plain that this is a right against the debtor-assignor, not the account debtor."  Forest Capital, LLC v. BlackRock, Inc., 658 F. App'x 675, 682 (4th Cir. 2016).  Because ARA possesses no cause of action against Waste Management under § 9-607, the Court must dismiss Count 1.

### E.    Count 2: UCC § 9-406

Section 9-406 of the UCC provides that

> an account debtor on an account, chattel paper or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee.  After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

Minn. Stat. § 336.9-406, subd. a.

Additionally,

> if requested by the account debtor, an assignee shall seasonably furnish reasonable proof that the assignment has been made.  Unless

the assignee complies, the account debtor may discharge its obligation by paying the assignor, even if the account debtor has received a notification under subsection (a) of this section.

Id. subd. c.

The Court holds that § 9-406 does not create a private right of action for the assignee, ARA. The language of the statute discusses the rights of the account debtor, not the rights of the assignee by explaining when the account debtor "may discharge its obligation" and avoid paying both the assignor and the assignee. Minn. Stat. § 336.9-406, subd. a.

The statute does not mention any rights held by the assignee or obligations imposed on the account debtor. The statute provides a possible defense to an account debtor who has already paid an assignee or assignor. This meaning is reinforced by comment 2, which states that "[s]ubsection (a) provides the general rule concerning an account debtor's right to pay the assignor until the account debtor receives appropriate notification. " Minn. Stat. 336.9-406, cmt. 2.

As the Fourth Circuit explained, "if section 9–406 grants any rights, it grants them to the account debtor. It grants no rights to the assignee and imposes no obligations on the account debtor; whatever 'obligation' the account debtor may have is assumed to exist already." Forest Capital, LLC, 658 F. App'x

at 680.  The purpose of § 9-406 is simply to clarify the account debtor's payment obligation after a debt is assigned.  <u>Id.</u> at 680-81.   If an account was properly assigned and notice was given, the assignee has the option of suing the account debtor for breach of contract or account stated.  <u>Id.</u> at 681.

Permitting a private cause of action would contradict the intent of the statute by "creating rights out of nothing more than a notification and submitting account debtors to obligations they never agreed to take on."  <u>Id.</u> at 681.  Section 9-406 serves to <u>protect</u> debtors, such as Waste Management, by "prevent[ing] different creditors from being paid twice for the same debt."  <u>In re Taranto</u>, No. 10-76041-AST, 2012 WL 1066300, at *11 (Bankr. E.D.N.Y. Mar. 27, 2012).  Because ARA possesses no cause of action against Waste Management under § 9-406, the Court must dismiss Count 2.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Docket No. 44] is **GRANTED**.

2.  Counts 1 and 2 of the Second Amended Complaint are
    **DISMISSED WITH PREJUDICE**.


Dated:   October 25, 2017            s/ Michael J. Davis
                                     Michael J. Davis
                                     United States District Court